EXHIBIT E

# Deposition of Christopher Hull

# O'Donnell/Salvatory, Inc. v. Microsoft Corporation

# December 29, 2021



**206.287.9066  |  800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

O'DONNELL/SALVATORI, INC., an  )
Illinois corporation,          )
                               )
                               )
        Plaintiff/Counterclaim )  No. 2:20-cv-00882-MLP
        Defendant,             )
                               )
v.                             )
                               )
MICROSOFT CORPORATION, a       )
Washington corporation,        )
                               )
        Defendant/Counterclaim )
        Plaintiff.             )
                               )


_____


   REMOTE VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

                            OF

                     CHRISTOPHER HULL

_____


                       7:33 A.M.

                  December 29, 2021

     (All participants appeared via videoconference.)




REPORTED BY:  Laura Gjuka, CCR #2057

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 2

1                    REMOTE APPEARANCES

2

  FOR THE PLAINTIFF (via videoconference):
3

          MARK LAWRENCE LORBIECKI
4         WILLIAMS, KASTNER & GIBBS PLLC
          601 Union Street, Suite 4100
5         Seattle, WA 98101-2380
          mlorbiecki@williamskastner.com
6

7   FOR THE DEFENDANT (via videoconference):

8

          PETER J. ANDERSON
9         DAVIS WRIGHT TREMAINE LLP
          865 South Figueroa Street, Suite 2400
10        Los Angeles, CA 90015
          peteranderson@dwt.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 5

1    CHRISTOPHER HULL,          witness herein, having been

2                              duly sworn by the Certified

3                              Court Reporter, testified

4                              under oath as follows:

5

6                    EXAMINATION

7    BY MR. LORBIECKI:

8        Q.  Good morning, Mr. Hull.  How are you?

9        A.  Very well.

10       Q.  Good.

11       A.  How are you doing, Mr. Lorbiecki?

12       Q.  Doing alright.  You're aware that the purpose of

13   today's session is to depose you in the case of

14   O'Donnell/Salvatori Music versus Microsoft, correct?

15       A.  Yes.

16       Q.  Okay.  Have you ever been deposed before?

17       A.  I have not.

18       Q.  Have you ever testified in court before?

19       A.  Yes, I have.

20       Q.  Now, you're aware that the oath that you were

21   just given has equal gravity to that if we were all

22   appearing in court; is that fair?

23       A.  Yes.

24       Q.  Now, in your deposition I'm going to be asking

25   you questions.  You'll be answering them under oath.

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                     Christopher Hull

Page 26

1    this report.

2       Q.   Are these royalty statements that were provided

3    to you as having originated with Sumthing Else?

4                    MR. ANDERSON:   Objection, vague and

5    ambiguous.

6       A.   No, these are royalty statements that would have

7    been -- I don't know where they originated, but they

8    were prepared and rendered to ODS, is my understanding.

9       Q.   How do you have that understanding?

10      A.   Because many of these payments reconcile to the

11   payments that Ms. Boschan represented in her report.

12      Q.   Do you have any independent basis?   For

13   instance, did you review the GL account referred to in

14   Column S in order to assure the payments were made?

15      A.   No.

16      Q.   I'm sorry, I didn't catch your answer.

17      A.   No.

18      Q.   Did you check the invoice references as they are

19   set out in Column T?

20                   MR. ANDERSON:   Objection, vague and

21   ambiguous.

22      A.   No.

23      Q.   What does Column Q, "Object Key," the heading to

24   Column Q, "Object Key," mean?

25      A.   I do not know.

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 28

1           MR. ANDERSON:  Objection, lacks

2    foundation that he used any interpretation of clearing

3    date in his report.

4        A.  I did not reference that.  I don't know the

5    answer to your question.

6        Q.  So is it fair to say that you would not rely on

7    the information in Column N to prove that payment was

8    made to ODS?

9        A.  I don't know.  I don't know what -- I didn't

10   rely on it in this report.

11       Q.  Do you have any independent information to

12   demonstrate that each of these payments were in fact

13   made?

14           MR. ANDERSON:  Objection, asked and

15   answered twice already.

16       Q.  (BY MR. LORBIECKI)  You may answer.

17       A.  I think the period -- the vast majority of these

18   represented payments for the time period that coincides

19   with the information set forth in the Boschan report

20   reconcile, and that independently confirmed that these

21   payments were in fact made for the periods for which the

22   data overlaps.

23       Q.  And that's the complete extent of proof that you

24   have that payments were made?

25       A.  That, and the existence of the royalty

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 29

1   statements and the fact that this report indicates

2   payments to have been made.  I am accepting that.

3       Q.  I'm going to refer you back to your Exhibit 1,

4   your report.  And, again, we're still on page 6 thereof.

5       A.  Got it.

6       Q.  You list 147 documents, but unlike the preceding

7   documents, you don't list Microsoft control numbers.

8              MR. ANDERSON:  Is that a question?

9       Q.  (BY MR. LORBIECKI)  Do you know --

10             MR. LORBIECKI:  I'll finish in a second.

11             MR. ANDERSON:  Okay.  Thank you.

12      Q.  (BY MR. LORBIECKI)  Do you know the control

13  numbers of those documents?  Do you know that they were

14  produced or Bates stamped?

15             MR. ANDERSON:  Objection, compound.

16      A.  As we're sitting here right now, I do not know.

17      Q.  In No. 6 you reference the Appendix A to this

18  report, "WC Music Data."  What was the source of

19  Appendix A?

20             MR. ANDERSON:  Objection, vague and

21  ambiguous.

22      A.  I presume it was prepared by Warner Chapell.

23      Q.  It doesn't -- I'm looking at the rebuttal

24  Schedule A.  I'm sorry -- yes.  Is that the Appendix A

25  referred to?

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 39

1    least that's what I heard.

2                MR. LORBIECKI:  7:30.  You're right.  I

3    apologize, Peter.

4                MR. ANDERSON:  No, no need to apologize.

5                MR. LORBIECKI:  You're right, 7:30.

6                MR. ANDERSON:  So back at 9:10?

7                MR. LORBIECKI:  Yes, 9:10.

8                MR. ANDERSON:  Okay.

9                (Short break taken.)

10   Q.  (BY MR. LORBIECKI)  Let's turn to page 8 of

11   Exhibit 1, your report.  Specifically, I want to -- you

12   were gracious enough to provide us with a thumbnail

13   overview of ASCAP at page 8.

14   A.  Uh-huh.

15   Q.  I wanted to ask you, how does a work come to be

16   registered with ASCAP?

17   A.  The music publisher would register the works.

18   Q.  And isn't it in fact the case that ASCAP has a

19   security system in place so that once a publisher

20   registers a work, it's only the publisher who can change

21   the attribution, both to the writers and to the

22   publisher?

23   A.  I do not know that.

24   Q.  Have you done registrations for any of your

25   clients?

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 40

1      A.   No.   No.   I'm not a music publisher.   I'm a

2   royalty accountant.

3      Q.   Are you familiar with the registration process?

4      A.   Not directly.

5      Q.   Do you know what a cue sheet is?

6      A.   Yes.

7      Q.   What is a cue sheet?

8      A.   It's a listing of music utilized in an

9   audio-visual production.

10     Q.   I'm going to set out my understanding of what

11  occurs in an ASCAP registration and payment, and to the

12  extent that you disagree with me, I'll ask the question,

13  how is it that you disagree or how have I gotten it

14  wrong?

15          So as I understand it, you stated, and I

16  agree, that the publisher has the responsibility to

17  register a work.  At that point, ASCAP has two different

18  ways to find out who is entitled to payment for

19  performance of the work.  One of the ways is its

20  independent investigation arm whereby it compares things

21  that are, say, posted on the web with what it knows as

22  the form of a work.  And the second way is by means of

23  cue sheets that are provided by the publisher to show

24  where the work has been performed.  Is your

25  understanding similar to mine?

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 41

1          MR. ANDERSON:  First, there's an
2    objection that counsel has misstated the witness's
3    testimony.
4      Q.  (BY MR. LORBIECKI)  Mr. Hull?
5      A.  Yes.
6      Q.  Is your understanding similar to my own?
7      A.  I don't think that the music publisher provides
8    the cue sheets to ASCAP.  I think the company that
9    produces the audio-visual work does that because they're
10   the only people in the world who will know what music
11   got used.
12     Q.  So once ASCAP has a cue sheet, what does it do
13   with the information in the cue sheet?
14     A.  It should utilize the cue sheet to report
15   royalties.
16     Q.  And how does it use the cue sheet to report
17   royalties?
18     A.  It should represent the report royalties to the
19   publishers set forth therein.
20     Q.  Is it the case that, for instance, a particular
21   type of performance has a mechanical royalty that
22   attaches to it so that ASCAP is aware of how much to
23   charge for the performance?
24          MR. ANDERSON:  I'm sorry, objection,
25   argumentative.

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 42

1      A.   Would you mind restating the question?

2      Q.   Let me ask it in a different fashion.  How does

3   ASCAP reckon the royalty that is due for a performance?

4      A.   It would rely on the cue sheets and whatever the

5   registrations are.

6      Q.   How would it determine the amount due for a

7   particular performance?

8      A.   ASCAP, as any PRO, has algorithms and

9   methodologies for attaching financial earnings to a

10  song.

11     Q.   If you were asked to audit ASCAP's distribution

12  of money, how would you determine whether ASCAP sent the

13  right amount of royalty to either of the publisher or

14  the performer?

15          MR. ANDERSON:   A performer?

16     A.   I've never been asked to audit ASCAP or any PRO.

17  I do a considerable amount of work on behalf of

18  songwriters, auditing music publishers, but I've never

19  been asked to audit a PRO.

20     Q.   On the same page of your report you speak of

21  SoundExchange.   SoundExchange -- does SoundExchange

22  administer its obligations with regard to these licenses

23  in the same or a very similar fashion to ASCAP?

24          MR. ANDERSON:   Objection, vague and

25  ambiguous, lacks foundation, calls for speculation.

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 43

1    Q.   (BY MR. LORBIECKI)  Well, let me ask it to you

2    differently then.  How would you distinguish how ASCAP

3    distributes royalties from how SoundExchange distributes

4    royalties?

5              MR. ANDERSON:  Objection, vague and

6    ambiguous.

7    A.   I think that the SoundExchange is specific in

8    their allocation of royalty earnings.  Those royalties

9    are triggered pursuant to United States copyright law

10   and paid by digital services who account to

11   SoundExchange at a statutory rate and they report actual

12   usage.  And SoundExchange prepares its distribution to

13   the copyright owner and the artist who perform or own

14   that master recording.

15   Q.   How is that different from how ASCAP determines

16   who is entitled to royalties?

17   A.   ASCAP has their own methodology for

18   determining -- their own rules and methodology for

19   determining financial compensation.  The allocation to

20   the publisher and the writer is very similar to

21   SoundExchange.  They're basically a 50 percent split,

22   ASCAP going 50 percent to the publisher, 50 percent to

23   the writer; SoundExchange going 50 percent to the

24   copyright owner, 50 percent to the performing artist.

25   Q.   Would a single performance result in liability

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 44

1    to ASCAP and to SoundExchange simultaneously for that

2    performance?

3                    MR. ANDERSON:  Objection, incomplete

4    hypothetical.

5        A.  What is the venue of the performance?  What type

6    of performance is it?

7        Q.  Let's put it on Pandora.

8        A.  Okay.  Pandora would have two liabilities, one

9    to ASCAP and one to SoundExchange.

10       Q.  So theoretically is it possible that those

11   royalties would be ultimately owed to four distinct

12   parties, that is to say, the publisher, the writer, the

13   performer, and the copyright holder?

14       A.  Yes.

15       Q.  How does AARC fit into this?

16       A.  AARC is basically blank media meant to

17   compensate copyright owners for recorded music taped

18   onto cassette tapes and CDs, that type of a thing.

19   There is a fee charged to the manufacturers of blank

20   media, and they would pay a lump sum unallocated amount

21   of money to AARC, who would then distribute it to its

22   members.

23       Q.  Is it distributed then uniformly to the members?

24                    MR. ANDERSON:  Objection --

25       A.  I don't really know.  I know that -- to be

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 45

1   perfectly honest, while I've always heard of AARC, I've

2   never seen a penny of AARC royalties reported to any of

3   my clients.

4       Q.   Where no cue sheet is submitted, how does ASCAP

5   determine who owes it and therefore its publishers and

6   songwriters money?

7               MR. ANDERSON:  Objection, incomplete

8   hypothetical.

9       A.   I don't know.  That's a music publisher's

10  question.  I'm a royalty accountant.

11      Q.   If you were to represent a hypothetical client

12  similar to but not the same as the estate of Aretha

13  Franklin and if there was a suspicion that persons were

14  performing the works without submitting cue sheets, what

15  would you do to assure that that hypothetical client

16  would receive its due share from ASCAP?

17              MR. ANDERSON:  Objection, argumentative.

18      A.   In the course of a royalty audit, we look for

19  unreported usages that may occur, and we take it up with

20  either the record company or the music publisher that

21  we're auditing.

22      Q.   How do you detect those sorts of events?

23      A.   Various Internet research, knowledge of the

24  client.

25      Q.   Has it been the case that ASCAP has come to you

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 46

1    with funds that were owed that were distinct from those
2    generated from cue sheets?
3                MR. ANDERSON:  Objection, vague and
4    ambiguous.
5       A.  Would you be able to clarify?
6       Q.  Are you aware as to whether ASCAP has its own
7    enforcement arm?
8                MR. ANDERSON:  Objection, vague and
9    ambiguous.
10      A.  I believe, yes, I think they do.
11      Q.  Do they monitor performances by artists where
12   cue sheets were not submitted?
13               MR. ANDERSON:  Objection, vague and
14   ambiguous.  I think you misspoke.  But unless you want
15   me to identify it, I'll just state the objection.
16      A.  Would you be able to clarify?  I'm sorry.
17      Q.  Let's leave it alone.
18               MR. ANDERSON:  I'm not sure what that
19   means.
20               MR. LORBIECKI:  I'm not going to reask
21   the question.
22               MR. ANDERSON:  So is the question
23   pending or withdrawn?
24               MR. LORBIECKI:  It's withdrawn.
25               MR. ANDERSON:  Okay.  Thank you.  I was

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 47

1    unclear.  Thank you.

2        Q.  (BY MR. LORBIECKI)  Do you see at the top of

3    page 9 in the paragraph enumerated 2, parenthesis, where

4    you've made a statement in that paragraph?  Do you see

5    the paragraph is what I guess I should ask.

6        A.  Yes.

7        Q.  I honestly simply do not understand what that

8    paragraph means.  Could you explain it to me in greater

9    depth?

10       A.  "Underpayment or nonpayment of soundtrack

11   royalties," I think this is referring to Boschan

12   Schedule 3.

13       Q.  Is the point that you're making in paragraph 2

14   that it is ASCAP who was supposed to be paying for

15   soundtrack royalties and not Microsoft?

16       A.  These are -- this is Schedule 3 of the Boschan

17   royalty report in which she says that a percentage of

18   Microsoft's net receipts are payable to ODS, and she's

19   talking -- it's her Schedule 3.

20       Q.  Okay.  I just wanted to know what the paragraph

21   meant.

22       A.  This is -- we're starting off, "The Boschan

23   report claims underpayments or nonpayments of the

24   following to ODS."  And number one is ASCAP,

25   SoundExchange, and AARC, and then we get onto No. 2

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 48

1   talking about the soundtrack royalties, the distribution

2   of the recordings.

3        Q.   Okay.

4        A.   That's Boschan's Schedule 3.

5        Q.   Yes.  Okay.  I get it now.  I just did not

6   understand the paragraph.

7        A.   Okay.

8        Q.   So I thought I would ask.  You are the author.

9   You seem the reasonable person to ask.

10       A.   Very good.

11       Q.   Looking now at page 10, and specifically I'm

12  looking at D, period, parens, 1, entitled "ASCAP," in

13  that paragraph, the first paragraph, referring to your

14  description of Schedule 2 of the Boschan report, you

15  disagree with the report's estimate of 124,209 as

16  underpaid in the writer's share of the ASCAP performance

17  royalties.  Could you explain how you disagree?

18       A.   Yes.  In the first instance, as previously

19  discussed, ASCAP royalties, performance royalties, are

20  paid to the publisher and the songwriter in equal

21  50 percent shares.  ODS itself is not a songwriter, and

22  so they wouldn't have standing to make collection of the

23  writer's share of royalties.

24       Q.   When you say ODS is not a songwriter, is it the

25  case that ODS sold its rights to Microsoft in Exhibit 2,

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 49

1   the ICA?

2               MR. ANDERSON:  Objection, vague and

3   ambiguous, argumentative.

4     Q.  (BY MR. LORBIECKI)  Let's do it this way:  What

5   was sold in Exhibit 2?

6               MR. ANDERSON:  Object to the extent it

7   calls for a legal conclusion, and the question is vague

8   and ambiguous.

9     Q.  (BY MR. LORBIECKI)  You may answer, Mr. Hull.

10    A.  I'm looking at Exhibit 2 right now.  Ownership

11   of the work was assigned to Microsoft.

12    Q.  Okay.  If your statement in Exhibit 1 that ODS

13   would not be entitled to royalties, how is it that ODS

14   could sell any rights?

15              MR. ANDERSON:  Objection, argumentative.

16    A.  The writer's shares of royalties would be

17   payable to the songwriters.  ODS is a corporate entity,

18   and it's not the songwriters.

19    Q.  If the work was composed by songwriters employed

20   by ODS in a work-for-hire situation, would it not in

21   fact be ODS who was the author of the song?

22              MR. ANDERSON:  Objection, an incomplete

23   hypothetical, calls for a legal conclusion, and is vague

24   and ambiguous because now you're referring to authors,

25   not writers.

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 50

1     A.   The writer's royalty would always be payable to

2     the writers, those employed by ODS, but not to ODS.

3     That's always how a work-for-hire works.   The songwriter

4     always gets their ASCAP royalties directly.

5         Q.   So in your statement that -- in your prior

6     testimony, I have at least understood it to be the case

7     that ASCAP would pay upon registration of the work; is

8     that correct?

9             MR. ANDERSON:   Objection,

10    mischaracterizes the testimony and vague and ambiguous.

11        A.   ASCAP would pay 50 percent of the royalty to the

12    music publisher, and they would pay 50 percent to the

13    songwriter.

14        Q.   What would happen if the publisher doesn't

15    register the work?

16        A.   Probably no royalties would be generated.

17        Q.   In your calculations in the rebuttal to

18    Ms. Boschan's own calculations of what is owed, haven't

19    you presumed that each of the works was properly

20    registered when you relied on the ASCAP royalty

21    statements?

22        A.   What I did was I took the ASCAP royalty

23    statements that Microsoft received for the publisher's

24    share and I identified what they had received for their

25    interest, their 50 percent of the pot, and whatever they

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 51

1    received is what -- is the royalty.  And because there's

2    a 50 percent/50 percent allocation, that has to be

3    basically equal to what the writers get.  And I think

4    that that takes case -- correctly addresses any

5    misregistration.

6        Q.   What about nonregistration?

7                MR. ANDERSON:   Objection, that's vague

8    and ambiguous.  It's not even a complete question.

9        Q.   (BY MR. LORBIECKI)  What liability arises when a

10   work is not registered?

11               MR. ANDERSON:   Objection, calls for a

12   legal conclusion.

13       A.   My understanding of your question, sir, is that

14   what percentage would be payable on that, and I think

15   because nothing was received, nothing's payable.

16               MR. LORBIECKI:  I'm going to show you

17   now what's been marked Exhibit 10.  Placing that now

18   into the chat room.

19       (Exhibit No. 10 marked for identification.)

20               COURT REPORTER:  I might be missing it,

21   but I don't think I have a 9.

22               MR. LORBIECKI:  Let me check.  You don't

23   yet have a 9.  There will be a 9.  It's coming.  I'm

24   sorry I took them out of order, but the way this went,

25   it just seems like now is a good time to dive into 10.

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 53

1    Q.  So if Microsoft elected not to file, then the

2    amount that would come to either of Marty O'Donnell,

3    Michael Salvatori, or ODS, one of those or several of

4    those entities, would be diminished by the failure to

5    file; is that correct?

6                    MR. ANDERSON:  Again, mischaracterizes

7    the testimony.

8    Q.  (BY MR. LORBIECKI)  Mr. Hull?

9    A.  I believe no royalties would be generated.

10   Q.  So doesn't your assumption that the publisher's

11   share of the royalties mirrors the writer's share of the

12   royalties presume that every filing was appropriately

13   made?

14                   MR. ANDERSON:  Objection, it's

15   argumentative.  There would be no publisher share if

16   there wasn't a registration, and your client admits that

17   all the registrations on all the music, including

18   Halo Legends, was registered.  So this line of

19   questioning is irrelevant, and I think you're missing a

20   fundamental point that there would be no publisher's

21   royalties if there was no registration.

22   A.  I'm sorry, should I be answering your question

23   right now?

24   Q.  No, I am looking at something.  I'll be a

25   moment.  I'm sorry.  I did not mean to suggest that you

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                     Christopher Hull

Page 54

1    owed me an answer at this point.

2            In turning again to page 9, under Roman

3    numeral IV, "Rebuttal of Analysis of Findings," you made

4    the statement that, in the paragraph beginning, "In my

5    consideration for alternate calculations, I recognize

6    that ODS brought its action against Microsoft on

7    March 10, 2020."  And then you set out to apply two

8    distinct statute of limitations calculations to

9    Ms. Boschan's calculations in order to diminish the

10   amount due; is that correct?

11           MR. ANDERSON:  Objection, argumentative

12   as to the last point.

13      A.  No, that wasn't my intent.  I prepared four

14   calculations in my report.  The first is what I believe

15   to be the liability.  The first alternate calculation

16   was what would the liability be if ODS was correct in

17   their position.  And then the second alternative

18   calculation was to determine what would the impact of

19   the six-year statute of limitations have on the amount

20   of the liability.  And the third alternative calculation

21   was what would be the effect of the liability if there

22   was a three-year statute of limitations.  That's what I

23   was trying to set forth.

24      Q.  What is the basis for asserting that a six-year

25   statute of limitations would apply to this case?

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 55

1          MR. ANDERSON:  Objection, calls for a

2     legal conclusion, and it's argumentative.

3        Q.  (BY MR. LORBIECKI)  Mr. Hull, what was your

4     basis for applying the six-year statute of limitations?

5        A.  A written contract dispute in the state of

6     Washington.

7        Q.  And where did you get that statute of

8     limitations?

9        A.  In discussing with my client's counsel.

10       Q.  On what basis did you apply a three-year statute

11    of limitations?

12       A.  On a similar basis, on the breach of applied

13    duty of good faith and fair dealing for this state of

14    Washington law.

15       Q.  Which would be the appropriate one to apply in

16    this case?

17          MR. ANDERSON:  Objection, calls for a

18    legal conclusion.

19       A.  I'm just -- I'm doing calculations, you know, to

20    give alternate views of the facts.

21          MR. LORBIECKI:  I'm going to place

22    Exhibit 9 in the chat room.

23       (Exhibit No. 9 marked for identification.)

24       Q.  (BY MR. LORBIECKI)  I'm going to ask you

25    specifically to go to pages 14 through 16 of Exhibit 9.

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 64

1   and the email in Exhibit 14 shows $2,019,000 in

2   royalties revenue for the period through 2013.

3       Q.  And so it's your testimony that these numbers do

4   align?

5       A.  These numbers -- they do because the 1,757,076

6   that I show is directly out of the Boschan report.

7       Q.  Now, in the course of performing your analysis,

8   did you observe any proofs of payment from Microsoft to

9   ODS?  And when I'm talking about proofs of payment, I'm

10  talking about sent check copies, bank wire transfer

11  documents, or other things that showed the actual

12  transference of money.

13      A.  I did not see those.  I saw other documents.

14      Q.  What other documents would show the actual

15  transference of the money?

16      A.  First off, the amounts confirmed by ODS is set

17  forth in the email that you had sent Cedar Boschan, so

18  that, I believe -- which reconciles very closely to the

19  royalty statements that accompanied those payments that

20  I referenced as well as the summary of Microsoft

21  payments to ODS.  Now, on top of that, I also referenced

22  advances in royalties paid in the agreements.

23      Q.  But if you take and add up the royalties in the

24  email, it doesn't amount to the same number as your

25  calculations reflect.  Aren't there missing payments?

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 65

 1      A.  I didn't pick up every payment in the -- that
 2    Excel file that you brought up before.
 3      Q.  So there were missing payments in the Excel file
 4    that you reviewed in that email; is that correct?
 5              MR. ANDERSON:  Objection, vague and
 6    ambiguous.
 7      A.  Could you repeat that?  Because there are
 8    payments shown in the Excel file that I didn't pick up.
 9      Q.  I'm not sure I understand what you mean by you
10    didn't pick them up.
11      A.  I didn't reflect them in my -- I didn't give
12    Microsoft credit for having made those payments, and the
13    reason I didn't is because some of the payments in that
14    file relate to fees rather than royalties.  In those
15    instances I didn't pick up the fees.
16      Q.  What are NMPA earnings?
17      A.  Where do you see that, sir?
18      Q.  What I'm asking is what are they or are you
19    familiar with them?  N, as in Nancy, M, as in Mary, P,
20    as in papa, A, as in alpha.
21      A.  I'm familiar with an organization called the
22    NMPA, which stands for the National Music Publishers'
23    Association, and what NMPA payments are could be
24    anything.
25      Q.  Were there any NMPA payments reflected in your

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                Christopher Hull

Page 66

1    analysis of the Boschan report?

2              MR. ANDERSON:  Objection, vague and

3    ambiguous.

4        A.  I don't know if I understand the question.

5        Q.  Did you see any payments paid to ODS -- did you

6    see any payments reflected from -- or NMPA performance

7    earnings reflected in the documents that you reviewed to

8    prepare your rebuttal?

9        A.  I don't understand what you're asking.  I did

10   not see any NMPA payments.  I don't know why I would,

11   and I don't know specifically what you're referring to.

12       Q.  I'm just asking if you saw any.  I think you

13   just testified that you did not; is that correct?

14       A.  I believe not.  I don't know what you're talking

15   about, to be honest.  I'd like to say that.  But I'm not

16   aware of anything marked "NMPA payment."

17       Q.  Under what circumstances would one receive a

18   payment, an NMPA payment?

19              MR. ANDERSON:  And just to be clear,

20   you're talking about from the association, from the NMPA

21   to someone?

22              MR. LORBIECKI:  That's correct.

23              MR. ANDERSON:  Okay.

24       A.  I'm aware -- one thing that comes to mind right

25   now is a settlement between the National Music

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 67

1    Publishers' Association and the Record Industry

2    Association of America in respect to pending and

3    unmatched songs, usages of compositions, that the record

4    companies would pay to the NMPA and then the NMPA would

5    then pay them on to the publishers.  But that is limited

6    to the major record labels.  Sony Music Entertainment,

7    Universal Music Group, and Warner Chapell -- Warner

8    Music Group, those are the entities that pay the NMPA

9    settlement.

10      Q.  Warner Chapell did in fact represent Microsoft

11   for the Halo properties during some of the time in

12   question, did they not?

13      A.  I misspoke when I said the word "Warner

14   Chapell."  The payments -- the NMPA payments would be

15   made by a separate and unrelated company, which I

16   believe is a separate legal entity, the record company

17   called Warner Music Group, right?  But Warner Chapell,

18   that's a separate question.  That would be -- we should

19   discuss that.

20      Q.  If there were NMPA payments, would they come

21   through the distributor?

22      A.  No.

23      Q.  I'm sorry, what?

24      A.  No.

25      Q.  No?  How would they come to Microsoft?

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 78

1    cassette, and it'd probably be gratis usage if it was in

2    a movie theater.

3        Q.   When you say gratis usage, what do you mean?

4        A.   There is no theatrical royalty in the

5    United States.

6        Q.   What if it's used --

7        A.   Music displayed in a movie house does not

8    attract a royalty.

9        Q.   What if music is played to promote the game?

10       A.   Like an advertisement?

11              MR. ANDERSON:   Objection -- okay.   Just

12   bear with me a second -- incomplete hypothetical, vague

13   and ambiguous.   I don't know what "how about" means.

14       Q.   (BY MR. LORBIECKI)   If music is used to promote

15   the game, is that one of the publishing revenue by

16   source that is listed under your 2019 U.S. publishing

17   revenue by source?   Does it fall within one of the

18   categories?

19       A.   If there's a fee that is attracted for an

20   advertisement that uses music, that would be a

21   synchronization usage.

22       Q.   If the music is used for the background of an

23   audiobook, where does it fall in here?   Which of these

24   categories?

25       A.   Probably other.

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 79

1    Q.  Could you explain that?

2    A.  To be honest, I've not come across that before.

3  I'm kind of taking a guess.  You're saying in an

4  audiobook where there is music playing in the

5  background.  That would be, I think, probably a specific

6  license.  I think that would be an "Other" usage.

7    Q.  Okay.  One second, please.  Did you do anything

8  to -- I'm going to skip Exhibit 16 for now so our court

9  reporter doesn't worry that we've missed something

10  inadvertently.

11          Did you do anything to truth-check the

12  royalty sheets from Sumthing Else for the period wherein

13  Sumthing Else was the distributor for the Halo games?

14    A.  I relied on Boschan's work.

15    Q.  Were you aware that there was -- that Sumthing

16  Else went into receivership?

17    A.  No.

18    Q.  And were you aware that the reason for going

19  into receivership included the misreporting of revenue?

20          MR. ANDERSON:  Objection, lacks

21  foundation and argumentative.

22          MR. LORBIECKI:  I'm going to ask you to

23  review Exhibits 17, 18, and 19, which I'm going to put

24  up in the chat.  And I'm going to point out to you that

25  large parts of each of the exhibits are, in fact,

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

Page 80

1   redacted.  I'm aware that they're redacted.  I'm not

2   asking you in any way to comment on the redactions.

3   They are redacted -- I said 17 and 18?  I guess only 17

4   and 18.  I'd like you to review them, please.

5     (Exhibit Nos. 17 and 18 marked for identification.)

6     Q.  (BY MR. LORBIECKI)  Mr. Hull, did you do

7   anything to check to see that the reporting submitted by

8   Sumthing Else was accurate?

9              MR. ANDERSON:  Objection, irrelevant.

10    A.  No.

11    Q.  Any calculations you made remain based on

12  Sumthing Else's reports of the revenue that they

13  distributed to Microsoft; is that correct?

14             MR. ANDERSON:  Objection,

15  mischaracterizes the testimony.  He's identified

16  multiple sources of information.

17    A.  I'm sorry, could you repeat the question?

18    Q.  When you calculated how much money Microsoft

19  received from Sumthing Else, did you rely on

20  Sumthing Else's reports of revenue?

21    A.  Yes, I suppose indirectly I did because I relied

22  on Ms. Boschan's report.

23    Q.  Let's go into page 20, wherein you assert that

24  Microsoft overpaid ODS by $135,586.  How do you arrive

25  at that number?

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 81

1      A.   Let's go to Schedule 3.

2      Q.   Okay.

3      A.   And I'll walk you through it.  There is two

4    schedules, 3A(i) and 3A(ii).  3A(i) is a calculation of

5    the royalties payable reduced by royalties paid

6    conforming to the period for which the Microsoft revenue

7    report was available.  So let's turn to 3A(i).

8      Q.   Okay.

9      A.   And here we have a summary of the revenue as

10   categorized in the Microsoft revenue report for the

11   period from June 2010, quarter ended, flip a few pages,

12   to PDF page 41.  And you'll see that the total revenue

13   generated by the various projects adds up to 1,944,000.

14   That's in the total column, the second column, and

15   numbers on page 41 of the PDF.

16     Q.   Okay.

17     A.   I then applied the ODS percentages as determined

18   by Boschan to come up with the prorated revenue for the

19   ODS tracks.  I then applied the 20 percent ODS royalty

20   percentage, the same percentage that Boschan used, to

21   come up with the amount payable of $279,000.  I then

22   credited Microsoft with $245,941 in payments as detailed

23   in Schedule 3A(i).  And we should probably switch to

24   schedule 3A(i) for a moment, which commences on PDF

25   page 43.  And if you go to PDF page 45, which is page 3

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                    Christopher Hull

Page 82

1     of 3 of this schedule, you'll see in the second column

2     of numbers $245,941.  That's how I came up with the

3     royalties paid for that period of time.

4        Q.  Now, ODS did not determine how much they were to

5     be paid.  That information was uniquely in the hands of

6     Microsoft.  In reviewing these documents, do you have a

7     reason why overpayment occurred?

8                MR. ANDERSON:  Objection -- the preface

9     is not a question, and it is actually false, but -- so

10    I'd object to that.

11       Q.  (BY MR. LORBIECKI)  Have you formed an

12    impression on how overpayment occurred?

13       A.  I think -- we only got halfway through the

14    schedule.  Do you want to go through the rest of the

15    schedule?

16       Q.  Sure.

17       A.  Okay.  3A(ii), which commences on PDF page 42 of

18    the file.  In that schedule you'll see total receipts

19    for the period from 2002 to the first quarter of 2010,

20    which is exactly the period for which Boschan picked up

21    revenue but didn't offset any payments.  So I don't have

22    revenue figures for that period of time other than the

23    Sumthing Else revenue figures which Boschan herself

24    summarized and prepared the schedule.  So I'm taking her

25    numbers.

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

O'Donnell/Salvatory, Inc. v. Microsoft Corporation                Christopher Hull

Page 85

1      A.  No.  No.  And just for clarity sake, the
2   royalties -- the revenue on which my royalty
3   calculations are based is basically the same -- it's the
4   same number -- within $8,000 of what Boschan did.
5   That's the difference, $8,000.  We're talking about the
6   same revenue.  The difference here is the payments.  And
7   you see the payments that I've given credit for.  I
8   don't know if those payments include the composition
9   "Reverie."
10     Q.  In every instance where you gave -- no, strike
11  that.
12          In looking at Rebuttal Schedule 3A(ii) --
13  strike that as well.  I apologize.
14          MR. ANDERSON:  No worries.
15          MR. LORBIECKI:  I'll tell you what.
16  It's early for a lunch break, yet I'd like a little bit
17  of time -- if you can eat early, that would be great,
18  but --
19          MR. ANDERSON:  I can eat early, but it's
20  been an hour anyway, so if you want to take a break and
21  then resume.
22          MR. LORBIECKI:  I figured there was a
23  break.  I wanted to take just a little bit more than ten
24  minutes.  So what I was going to suggest is if it's okay
25  with the court reporter, could we all take our lunch

1c95c0f5-fb7e-42e8-ab24-bfd6b55c7703

Page 93

1   Catherine Brumbaugh, is trying to reach Erika in order

2   to download that.

3       Q.   (BY MR. LORBIECKI)  I would certainly appreciate

4   any help in our getting it because if I'm understanding

5   you, everything -- that spreadsheet did not change the

6   Microsoft overpayment from the years from 2010 to

7   current; is that correct, Mr. Hull?

8       A.   I think basically for the period from -- and

9   it's best to look at Schedule 3A at this point on

10  page 36 of the PDF.  For the period from April 1st,

11  2010, to June 30th, 2021, I do believe that there's an

12  underpayment of $33,077, but it's more than consumed by

13  the overpayment that existed as of March 31st, 2010.

14  And so it ends up to be a net overpayment of 135,000.

15      Q.   And your schedule 3A(i) is based on that one

16  spreadsheet, correct?

17      A.   Yes.  And, you know, for what it's worth, it's

18  within $8,000 of Cedar Boschan's calculations.

19      Q.   So I guess what you're saying -- and I'm not

20  trying to put words in your mouth, so if I'm wrong just

21  tell me I'm wrong.  But I guess what you're saying is

22  for the period for which we are missing the spreadsheet,

23  her prediction of what occurred is within 80,000 of your

24  prediction; is that correct?

25      A.   8,000.